IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. CROIX

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | **CRIM. NO.: 10-cr-0009** |
| v. ) | |
| ) | |
| STEPHEN GARVEY, a/k/a "BIGGA" ) | |
| MALIK GARVEY, ) | |
| ORLANDO CARINO, ) | |
| DAREN HENRY, ) | |
| CHRISTOPHER JACOBS a/k/a "KIMO," ) | |
| DAVID ROLDAN a/k/a "BEBO," ) | |
| ALPHONSO GARVEY, and ) | |
| EDWARDO GOMEZ ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

**MEMORANDUM OPINION**

Finch, Senior Judge

    THIS MATTER is before the Court on Defendant Stephen Garvey's Motion to Suppress Wiretap Evidence. For the reasons stated below, Stephen Garvey's motion to suppress the wiretap evidence is DENIED.

### I. BACKGROUND

Stephen Garvey and his co-defendants Malik Garvey, Orlando Carino, Daren Henry, Christopher Jacobs, David Roldan, Alphonso Garvey and Edwardo Gomez have been charged in a seven-count indictment with one or more of the following crimes: (1) conspiracy to possess and distribute a controlled substance, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(B) (count I); (2) possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C.

§§ 924(c)(1)(A)(i) (counts II and III); (3) knowingly and intentionally possessing, with intent to distribute less than 50 kilograms of marijuana, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(D) and 18 U.S.C. § 2 (count IV); knowingly and intentionally using a communications facility (a telephone), while engaging in a conspiracy to possess with the intent to distribute marijuana, in violation of 21 U.S.C. § 843(b) (counts V,VI and VII).[1]

Stephen Garvey has filed a motion to suppress wiretap evidence with the following co-defendants seeking to join in his motion: David Roland, Orlando Carino, Alphonso Garvey and Edwardo Gomez. Garvey contends that the evidence must be suppressed because the affidavit contained false and misleading information and failed to establish the necessity for a wiretap warrant. (Mot. at 5, 7.) The Government argues that Garvey's motion should be denied because he has not identified any factual recitation as being false or misleading and because the affidavit clearly showed the need for interception. A hearing was held on the matter on September 16, 2010.

### A. WIRETAP APPLICATION

The affidavit at issue was submitted in support of an order authorizing interception of wire communications by Special Agent James Semrick ("Semrick") of the Drug Enforcement Administration ("DEA") on October 26, 2009. Agent Semrick sought and received permission to intercept target telephone #1 (340-514-9871) and target telephone #2 (340-332-5447) for a period of time not to exceed 30 days. Semrick averred there was probable cause to believe Garvey used these telephone lines in connection with drug-trafficking.

---

[1] The Government also seeks, pursuant to 21 U.S.C. § 853, forfeiture of a 2003 Dodge Ram and firearm and ammunition allegedly used in the commission of the violations charged.

In his affidavit, Semrick sets forth details concerning the investigation into a drug conspiracy involving Garvey and several others, including several defendants in this criminal matter.[2] Semrick also identifies the telephone numbers of Garvey's associates and lists the times and dates Garvey used the target telephone lines to communicate with those individuals. (Aff. ¶¶ 80-83.)

According to Semrick, Garvey's drug-trafficking activities was brought to the attention of the government in 1998 when Garvey was identified by confidential sources as having utilized his employment as a baggage handler when he worked at the airport in St. Croix to aid and participate in the transportation of multiple kilograms of cocaine aboard commercial airlines to the mainland United States. (Aff. ¶ 12.) Search warrants were executed at residences associated with Garvey but were, according to Semrick, of limited success and failed to reveal the extent of Garvey's role in the conspiracy. (*Id.*) Several years later, in October 2005, a conversation between Garvey and Zacheus Blake was intercepted in a wiretap investigation of Blake. In that conversation Blake and Garvey discussed the purchase of controlled substances. Blake was subsequently convicted of federal charges related to the investigation. (Aff. ¶ 13.) The investigation that was underway when Semrick filed his wiretap application commenced on January 30, 2009 when the FBI received an anonymous tip concerning a package sent from El Paso, Texas to Christiansted, St. Croix, in the Virgin Islands. (Aff. ¶ 14.) A confidential informant ("CC-1") stated that the box destined for St. Croix was believed to contain marijuana. (Id.) With the aid of the United States Postal Service, the FBI determined that the delivery address for the package was Mailboxes N' More ("Mailboxes"), a business owned by defendant

---

[2] Semrick averred that there was probable cause to believe that Stephen Garvey, Orlando Carino, Fnu Lnu, Felix Parilla, Dawn Sewer, Carmen Cepeda, Daren Henry, Cleon Harrison and other persons yet unidentified, were involved in distribution of cocaine and marijuana.

3

Daren Henry. On January 31, 2009, while conducting surveillance of MailBoxes, agents observed Henry speaking with Garvey in front of the store. Later that day, Orlando Carino was detained and later arrested after he picked up the package from Mailboxes. The package contained 25 pounds of marijuana. Agents also retrieved a shotgun and ammunition from Carino's vehicle. Carino, denying knowledge of the contents of the package, told FBI agents that he had been sent to pick up the package by Garvey. Carino agreed to cooperate with law enforcement and provided two telephone numbers for Garvey: and 340-514-9871 (target telephone 1) and 340-473-6818 (Garvey's secondary cellular phone).[3]

Semrick attested that the criminal investigation of Garvey and his associates' activities thereafter proceeded along several fronts, and employed a broad range of investigative techniques. First, the government attempted to use Orlando Carino as an informant. Shortly after being arrested at Mailboxes, Carino agreed to meet with Garvey and record their conversation. (Aff. ¶ 30.) Carino did so but talked incessantly, giving Garvey little opportunity to make incriminating statements. Subsequently, Carino declined to provide further information to the government. Instead, he maintained contact with Garvey through phone calls and in-person meetings, and even conducted counter-surveillance of the officers investigating Garvey by taking their photographs. Carino's conduct indicated he did not intend to cooperate with the Government and he was deactivated as a source. (Aff. ¶ 33-43.)

The FBI also used administrative subpoenas to acquire information pertaining to the shipment of the marijuana package from Mailboxes and interviewed the owner Daren Henry.

---

[3] Through administrative subpoenas and pen register court order requests, the FBI determined that the subscriber of 340-473-6818 was Steven Garvey and the subscriber of 340-514-9871 was Charmaine Smith. Further investigation revealed that the number subscribed to by Smith was associated with Garvey's email address and that Garvey also used a post office box associated with Smith, leading the FBI to conclude that Smith was used as a front to avoid detection by law enforcement. (Aff. ¶ 22.) These telephone numbers were the targeted lines which the government sought to intercept.

4

Henry told police that anyone can ship a package to Mailboxes for a $5.00 fee. However, Henry had waived the fee for Carino and allowed him to pick up the package although it was not addressed to him.[4] Henry explained that anyone could pick up a package if they call first and claimed that someone had called for the package but he could not remember his name. A review of the toll records for Garvey revealed that Henry had called him several times the day that Carino picked up the package, leading police to believe that Henry was providing false and misleading information. (Aff. ¶¶ 32-34.) Thus, the Government concluded that Henry was not likely to assist in the investigation of the drug-conspiracy.

The agents also employed administrative subpoenas to obtain electronic information useful in linking Garvey to the confiscated package of marijuana. The postal service identified several IP addresses used to track the progress of the package in the mail, including IP address (208.84.199.158). Agents served an administrative subpoena on Broadband VI to obtain the name of the subscriber of that IP address (208.84.199.158) (Aff. ¶¶ 37-38.) Broadband VI listed the subscriber of that home address as Dodeanna and Stephen Garvey with service at 219 Sion Hill in St. Croix, Garvey's home address. Semrick also obtained a search warrant of Garvey's email account and confirmed that the IP addresses used for tracking the packages had been used by Garvey to log on to his email account. The emails also revealed Garvey's possession of firearms but did not reveal additional information concerning his drug trafficking activities. (Aff. ¶¶ 35-37.)

FBI agents also attempted to gather information about Garvey's trafficking activities by conducting surveillance on his movements and his home. To this end, they installed a GPS tracker on his vehicle on two separate occasions. The first installation was unsuccessful because

---

[4] The package was apparently addressed to a fictitious person, Luis Castillo. (Aff. ¶¶ 21, 27.)

the tracking device apparently malfunctioned, while the second installation failed because Garvey had discovered and removed it from his car. (Aff. ¶¶ 44-48.)

While the investigation proceeded apace on St. Croix, the government also employed a confidential informant and undercover agent in Texas to uncover information about the drug-trafficking operation. The confidential informant ("CS-1") provided information to agents concerning the shipment of marijuana through the mail to the Virgin Islands and Georgia on behalf of an individual then known only as "B."[5] CS-1 also confirmed that he had shipped the package of marijuana intercepted at Mailboxes in January 2009. CS-1 stated that "B" had given him the package and the address and that CS-1 shipped the package to the U.S. Virgin Islands. However, CS-1 stated that he did not know anyone in the U.S. Virgin Islands and that he has never called anyone there. (Aff. ¶¶ 50-61.) Under the supervision of DEA agents, CS-1 also conducted drug transactions with B by telephone, with CS-1 agreeing to ship marijuana to B to an address in Georgia. (Aff. ¶¶ 64-66.) CS-1 then introduced an undercover agent to B as his source of supply for marijuana. B agreed to purchase up to fifty pounds of marijuana from the undercover agent for shipment to St. Croix, U.S. Virgin Islands. (Aff. ¶ 67.) B later asked CS-1 to send sixty pounds of marijuana to the following recipients and addresses: Gillian Harper at Paradise Mills B2, Apt. #4, Frederiksted, VI 00840 and Anthony Garvey Sr., 696 Barren Spot, Christiansted, VI 00820. (Aff. ¶ 68.) Eventually, the undercover agent, expressing concern about getting paid by the recipient of the marijuana in St. Croix, convinced B to introduce him to Garvey in a three-way conference call on September 28, 2009. A few days after the conference call, Garvey called CS-1 and indicated that he wanted to deal directly with the undercover agent, whom he believed to be the source of the marijuana. Subsequently, the undercover agent spoke

---

[5] "B" was later identified as defendant Christopher Jacobs.

with Garvey several times regarding Garvey's interest in purchasing marijuana and cocaine from him. Garvey indicated that he would be willing to travel to El Paso, Texas to purchase about two hundred pounds of marijuana. Garvey also offered to send his son, who lived in Dallas. (Aff. ¶¶ 71-72.) During one recorded conversation relating the method of shipping marijuana inside compressors that had been opened and then welded shut to prevent detection, Garvey discussed his prior experience using compressors to smuggle marijuana from Jamaica. (Aff. At ¶ 74.)

In his affidavit, Semrick also describes the investigative procedures that had been tried and failed, or appeared unlikely to succeed if tried: (1) physical surveillance/pole cameras; (2) confidential sources; (3) undercover officers; (4) arrests/search warrants; (5) interviews of subjects and associates; (6) interviews of subjects and associates; (7) pen register and telephone toll records; (8) consent and trash searches; (9) mail covers; (10) reverse buy; (11) beepers; (12) financial investigations; (13) consensual monitoring. (Aff. ¶¶ 86-109.) Semrick provides reasons why each technique would prove unfruitful, hamper the criminal prosecution, or provide the government with only limited information regarding the individuals involved in the conspiracy and the scope of their individual criminal activities.

## II.     ANALYSIS

Garvey contends that the affidavit in support of the wiretap did not meet the criteria of Title III of the Omnibus Crime Control and Safe Streets Act, codified at 18 U.S.C. §§ 2510 et seq., which governs the interception of wire, oral or electronic communications.

As the Third Circuit has noted, the federal wire interception statute a wiretap application must show probable cause in three different contexts:

The first is that an individual has or is about to commit one of several enumerated offenses . . . the second: that particular communications relating to the charged offense will be obtained through the interception; third: the premises where the interception will be made are being used in connection with the charged offense.

*United States v. Armocida*, 515 F.2d 29, 35 (3d Cir. 1975) (citing 18 U.S.C. § 2518(3)(a), (b) and (d)).

In addition, § 2518(b) requires that an affiant provide

> a full and complete statement of the facts and circumstances relied upon by the applicant, to justify his belief that an order should be issued, including (i) details as to the particular offense that has been, is being, or is about to be committed, (ii) except as provided in subsection (11), a particular description of the nature and location of the facilities from which or the place where the communication is to be intercepted, (iii) a particular description of the type of communications sought to be intercepted, (iv) the identity of the person, if known, committing the offense and whose communications are to be intercepted.

18 U.S.C. § 2518(b).

Garvey attempts to mount a *Franks* challenge to the wiretap warrant, alleging that the affidavit of Semrick contained "false and misleading information, violating the requirement for a full and complete statement or probable cause." (Mot. at 5.)

To sustain a challenge to the veracity of assertions contained in an application for a search warrant, a defendant must meet the standards set forth by the Supreme Court in *Franks v. Delaware*:

> To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient. The deliberate falsity or reckless disregard whose impeachment is permitted today is only that of the affiant, not of any nongovernmental

informant. Finally, if these requirements are met, and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required.FN8 On the other hand, if the remaining content is insufficient, the defendant is entitled, under the Fourth and Fourteenth Amendments, to his hearing. Whether he will prevail at that hearing is, of course, another issue.

438 U.S. 154, 171-72 (1978).

Here, Garvey contends that factual assertions in Semrick's affidavit regarding Garvey's employment at the St. Croix airport, and statements that he made to Zacheus Blake in 2005 were false or misleading. In Semrick's affidavit, it states that "in a 1998 investigation, Garvey was identified by four separate confidential sources utilizing his employment as a baggage handler at the airport in St. Croix to aid and participate in the transportation of multiple kilograms of cocaine aboard commercial airlines to the mainland United States." (Aff. ¶ 12.) At the motion to suppress hearing, Garvey presented the testimony of two witnesses, Charmaine Smith, and David Sweeney. Smith testified that Garvey stopped working at the airport in St. Croix in 1994 and Sweeney testified that Garvey was employed by the Department of Health as an EMT worker in 1995. Garvey argues that this constitutes evidence that the statement in the affidavit regarding his role in drug-trafficking at the airport was false. However, as agent Semrick pointed out, the affidavit merely documents the date the information about Garvey's illicit activities came to the attention of the government, not the date in which he allegedly engaged in these activities. The Court agrees that Semrick did not aver that Garvey worked at the airport in 1998. Thus, the testimony provided by Garvey's witnesses does not establish the falsehood of the statement concerning his employment at the airport.

Garvey also objects to the inclusion in the affidavit of the statements Garvey allegedly made to Zacheus Blake in 2005. As reported in Semrick's affidavit, Blake asked Garvey, "you can't

9

sell me a thing for six . . . a half?" The affidavit states that "this coded conversation is believed to be related to Garvey's sale of a half kilogram of cocaine to Blake for $6,000.00." (Aff. ¶ 13.) According to Semrick, "[l]ater in the conversation, Garvey told Blake that he would stop by to see Blake and show him (Blake) a "vibe," a coded term for drugs." (*Id*.) At the hearing on this motion, Attorney Martial Webster objected to the interpretation of this conversation, and in attacking the meaning attributed to "vibes" made the following statements:

> I know street language and I know vibe has never been associated with drugs. You bring a thousand people in here from the high schools, from the college, and on the street and you ask them what vibes mean, and all of them will tell you vibes has nothing to do with drugs. Vibes comes from the word vibration.

Counsel for Garvey also asserted that Semrick had intentionally or with reckless disregard misrepresented the meaning of "vibe." Semrick testified that he was told by Christopher Howell, who was the case agent in the Blake matter, that the word "vibe" referred to drugs. However, Howell was not present to testify. The fact remains, however, that the burden of proof was on the defendant to show that statements in the affidavit were "deliberate falsehood[s]" or made with "reckless disregard for the truth." *Franks*, 438 U.S. at 171. Counsel for Garvey was not a witness in this matter and his assertions do not constitute testimony. Therefore, the Court finds that there is no basis for concluding that "vibes" could not be used to refer to drugs and that Semrick had intentionally misrepresented the meaning of Garvey's conversation with Blake.

Moreover, even if the Court had concluded that the statements in paragraphs 12 and 13 were false or made with reckless disregard, and set aside those paragraphs, "there remains sufficient content in the warrant affidavit to support a finding of probable cause" in the remaining 69 paragraphs, where Semrick sets forth in detail facts concerning Garvey's role in the drug-trafficking conspiracy. *Id*. at 171-72.

Garvey also contends that the affidavit did not comply with the necessity requirement of the wiretap statute. Pursuant to § 2518(1)(c), an application for wiretap order must include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."

This additional precondition to obtaining a § 2518 authorization was established by Congress in order "to make doubly sure that the statutory authority be used with restraint and only where the circumstances warrant the surreptitious interception of wire and oral communications." *United States v. Vento*, 533 F.2d 838, 849 (3d Cir. 1976) (citations omitted). "These procedures are not to be routinely employed as the initial step in criminal investigation" and "wiretapping is not to be resorted to in situations where traditional investigative techniques would suffice to expose the crime. " *Id*.[6] "[A]pplications whose sole bases are general declarations and conclusory statements by the affiants will not support authorizations." *Id*. " The use of "boiler plate" and the absence of particulars in requests for wiretap authorizations have not been permitted lest wiretapping become established as a routine investigative recourse of law enforcement authorities, contrary to the restrictive intent of Congress." *Id*. at 849-50.

However, the burden of proof imposed on the government in establishing necessity is "not great." *Armocida*, 515 F.2d at 38. "To support a finding that normal investigative procedures are unlikely to be successful" the court is only required to find "a factual predicate in the affidavit." *Id.* Moreover, "the government is not required to exhaust all other investigative procedures before resorting to electronic surveillance." *United States v. Williams*, 124 F.3d 411, 418 (3d Cir.1997)). The government need only show "that the other techniques are impractical

---

[6] Traditional investigative techniques include "standard visual or aural surveillance techniques by law enforcement officers, general questioning or interrogation under an immunity grant, use of regular search warrants, and the infiltration of conspiratorial groups by undercover agents or informants." *Armocida*, 515 F.2d at 37 (citing 1968 U.S.Code Cong. & Admin.News at p. 2190)).

11

under the circumstances and that it would be unreasonable to require pursuit of those avenues of investigation." *Vento*, 533 F.2d at 849.

In this case, Garvey asserts that Agent Semrick failed to meet that burden. However, contrary to Garvey's assertion that Semrick used "boilerplate language," Semrick's affidavit recounts in detail other investigative techniques that were employed, such as physical surveillance of Garvey and his associates, administrative subpoenas of email and cellular phone accounts, interviews with associates of Garvey, as well as the use of confidential informants and an undercover agent.

In addition, Semrick indicated why such techniques had limited success and why others that had not been implemented were unlikely to be successful. For example, Semrick explained that physical surveillance of Garvey and his residence was unsuccessful because of counter-surveillance techniques employed by Garvey, such as installing cameras at his house, and that observation of Garvey's movements would not be helpful due to Garvey's use of couriers to pick up shipments of drugs from Mailboxes as well as the United States Postal Service. Semrick's assessment of the available investigative techniques was based on the government's objective in prosecuting this drug-trafficking conspiracy, which was to identify all participants in the conspiracy as well as the scope of the drug dealing activities of these individuals. (Aff. ¶¶ 94, 98). Given that objective, Semrick asserted in his affidavit that techniques such as the use of pen registers and telephone toll records, physical surveillance or search warrants were unlikely to provide the government with sufficient information regarding the nature of the criminal activities that the defendants were engaged in.

In *Armocida*, the Third Circuit found arguments such as the ones enumerated above sufficient to establish necessity. In that case, the government was investigating a narcotics conspiracy and sought authorization to use a wiretap. 515 F.2d at 34, 36. Following their conviction, the defendants challenged the admissibility of the wiretap evidence on the basis that the application failed to establish necessity. *Id*. at 37. However, the Third Circuit rejected that argument and noted that the affidavit filed in support of the wiretap application

> reveal[ed] a history of **physical surveillance; utilization of informants; undercover agents**; and other wiretap interceptions. **All of these failed to determine the scope of the conspiracy and to identify the participants**. Having failed through these techniques, Greene's affidavit then recites that: (1) the informant would not testify; (2) **surveillance was too easily noticeable and could jeopardize the investigation** (surveillance, as noted, had already failed); (3) **a search warrant was unlikely to reveal either the identities of those believed involved in the conspiracy** to distribute heroin or the source of the heroin

*Id*. at 38 (bolding added).

The Court of Appeals concluded that, in light of the the government's objective "to ascertain the scope of the alleged narcotics conspiracy and to identify the participants," the affidavit was sufficient to support a finding of necessity. *Id*.

A similar conclusion was reached by the Third Circuit in *United States v. Vento*, another conspiracy case, this one involving the theft of interstate goods. The court noted that "[a]lthough normal investigative techniques might have been sufficient to implicate [the defendant] in thefts from interstate shipment, such approaches could not show the scope of the conspiracy or the nature of [the defendant's] on-going criminal activity." 533 F.2d at 850. The *Vento* court made the following observations regarding the prosecution of criminal conspiracies:

> Investigations are not restricted to crimes which can be probed satisfactorily by normal methods. In the proper circumstances, the instrumentalities of Title III may be employed to discover the full extent of crimes and conspiracies. The government sought to know the full nature of Gregorio's [the defendant's] schemes for theft from interstate shipment. That could

13

be discovered only by learning from whom Gregorio was then purchasing stolen goods, and to whom he was then selling them, and the times and methods of those transactions. Witnesses who had past experience with Gregorio were necessarily of limited utility; prolonged physical surveillance was not possible; and search warrants would provide only a portion of the necessary information.

*Id*.

Here, Semrick and other law enforcement officers were faced with a similar situation: they needed to ascertain the full extent of the participants' conspiratorial activities and the traditional investigative methods employed had, after a period of nine months, failed to yield results. Moreover, Semrick also pointed out that successful infiltration in the conspiracy by the confidential informant and the undercover agent was unlikely and an attempt by the undercover agent would possibly be dangerous given the close-knit group of family members and long-term friends who formed the leadership of the conspiracy. This assertion also supports a finding of necessity. *See e.g., United States v. Phillips*, 959 F.2d 1187, 1190 (3d Cir. 1992) (finding necessity had been established where the government had asserted that "the use of an undercover agent would have been too dangerous due to the close association of the conspiracy's members and because the area was a small community where everyone was acquainted and outsiders would have been immediately suspect.")

In line with the reasoning of the Third Circuit cases cited above, the Court finds that the government had established sufficient need for the use of a wiretap interception of Stephen Garvey's cellular phones.

## III. CONCLUSION

The Court finds that the wiretap application provided the requisite level of probable cause and adequately established that other investigative procedures had been tried and failed or were reasonably appeared to be unlikely to succeed if tried or to be too dangerous. Thus, the Court will deny defendant Stephen Garvey's motion to suppress the wiretap evidence. A separate order accompanies this memorandum opinion.

**ENTER**:

Dated: September 17, 2010

_____/s/_____
RAYMOND L. FINCH
SENIOR U.S. DISTRICT JUDGE